UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEAST DIVISION



04 MAR 31  PM 4: 42

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| MAURICE JEFFERSON, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-01-CO-02366-NE |
| ROADWAY EXPRESS, INC., | ] |
| Defendant(s). | ] |

ENTERED

MAR 31 2004

## MEMORANDUM OF OPINION

I.   INTRODUCTION.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964.  The court has for consideration a motion for summary judgment or partial summary judgment, filed November 7, 2002, by defendant Roadway Express, Inc. (hereinafter, "Roadway"). [Doc. 53.]  Also before the Court is Roadway's motion to exclude the EEOC determination, filed January 16, 2003. [Doc. 70.]  The issues have been briefed and are now ripe for decision. Upon due consideration, and for the reasons set out below, the motion to exclude the EEOC determination will be granted.  The motion for summary judgment will be denied, without prejudice.  The motion for partial

88

summary judgment will be granted as to Jefferson's disparate treatment claims.

## II.   SUMMARY JUDGMENT STATEMENT OF FACTS.[1]

The defendant, Roadway, is a trucking company that hauls freight to and from various locations in the United States.  Plaintiff's Brief, Doc. 67, (hereinafter, "Pl's Br.") p. 1; Defendant's Brief, Doc. 60, (hereinafter, "Def's Br.") p. 2.   The plaintiff, Maurice Jefferson (hereinafter, "Jefferson"), is an African-American male who was employed by Roadway on September 12, 1999, as a full-time driver at its Huntsville terminal.  Pl's Br. p. 1; Def's Br. pp. 3-4.[2]  Jefferson held this position until he was laid off in October 2001.  Pl's. Br. p. 1.  Jefferson is not challenging his lay off from Roadway.  *Id.*

---

[1]In developing the facts for this opinion, the Court considered the facts proposed by the parties in their briefs and the Court's own examination of the record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2]Jefferson had been working at Roadway for a short period of time as a "casual" or part-time driver. *Id.*

The Huntsville terminal manager at all pertinent times was Stanley Shanks.  Pl's. Br. p. 1-2; Def's. Br. p. 2.  Shanks supervises the dock supervisors and the dispatchers at the Huntsville terminal.  *Id.*  Nathan Rozea and Jeff Gordon were dock supervisors, responsible for supervising the correct loading and unloading of freight by the drivers.  Pl's. Br. p. 2; Def's. Br. p. 2. Phil Massey was a dispatcher, responsible for planning deliveries and pickups so that Roadway can meet customer demands.  *Id.*

III.   THE MOTION TO EXCLUDE.

On October 4, 2000, Jefferson filed a charge of discrimination with the EEOC.  Plaintiff's Summary Judgment Exhibits, Doc. 62 (hereinafter, "Pl's Ex."), Ex. 12.  He initiated this action on September 20, 2001.  On September 23, 2002, the EEOC issued its determination that there was "reasonable cause to believe that [Roadway] discriminated against [Plaintiff] with respect to discriminatory discipline, job assignment, assignment of equipment, denial of awards and exclusion from safety meetings."  Pl's Ex. 14.  The EEOC also determined that Roadway discriminated against Plaintiff and "[b]lacks as a class by subjecting them to a racially hostile work environment, denying them equal promotional opportunities to supervisory

positions, assignment to less favorable jobs, unequal assignment of equipment and discriminatory discipline." *Id.*

Roadway contends the EEOC determination should be excluded under Fed. R. Evid. 803(8) because it is hearsay which does not meet the "trustworthiness" requirements for admission of public documents, under Rules 401 and 403 because it is irrelevant, and under Rule 403 because it is more prejudicial than probative.

The EEOC's final decision regarding a claim of discrimination is admissible under Fed. R. Evid. 803(8)(C), providing for admissibility of public records and reports setting forth factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness. *Chandler v. Roudebush*, 425 U.S. 840, n.39 (1976). However,

> [t]he admission of an EEOC report, in certain circumstances, may be much more likely to present the danger of creating unfair prejudice in the minds of the jury than in the mind of the trial judge, who is well aware of the limits and vagaries of administrative determinations and better able to assign the report appropriate weight and no more.

*Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995),

*citing Barfield v. Orange County,* 911 F.2d 644, 651 (11th Cir. 1990) and

*Johnson v. Yellow Freight System, Inc.,* 734 F.2d 1304, 1309 (8th Cir. 1984)

(for the proposition that "EEOC reports are not homogenous products but

may vary greatly in quality and factual detail").  Thus, in the Eleventh

Circuit, EEOC determinations are generally admissible in bench trials, but

are subject to more limited admissibility in jury trials.  *Walker,* 53 F.3d at

1554.[3]  "In particular, the difference between a bench and a jury trial may

affect the district court's analysis of a determination letter's admissibility

under Federal Rules of Evidence 403."  *Id.*  The decision concerning

admissibility of the EEOC's determination letter, as with any evidence, is

committed to the broad discretion of the trial court and will be  reversed

only upon a clear showing of abuse of discretion.  *Id.*  The district court

must make the admissibility determination on an individual basis,

---

[3]The plaintiff argues that this summary judgment proceeding is more akin to a bench trial, and that the court should not consider the prejudicial weight of the evidence as if it were presented to a jury.  However, in ruling on a summary judgment motion, this court must determine if there is a genuine question of material fact necessitating a trial.  That exercise would be futile if the court considered evidence which the jury could not consider.

considering the evidence's probative value and the danger of unfair prejudice. *Latham v. Dep't of Children and Youth Svcs.*, 172 F.3d 786, 791 (11th Cir. 1999).

Being mindful of this court's duty to assure the full availability of the judicial forum in employment discrimination cases, *Walker*, 53 F.3d at 1554, the court finds the probative value of the EEOC determination letter is outweighed by the danger of unfair prejudice. The letter includes only the conclusion of the district director, without even minimal details about the investigative procedure used or the data considered. Without some indicator of the basis for the determination, this court cannot conclude that the EEOC's sources of information were trustworthy, that the investigation was timely, or that a hearing was held. *See* Rule 803(8)(C), and Advisory Comments. Certainly, the lack of supporting detail limits the probative value of the determination. Given the minimal probative value of the submission and the danger that the jury will place undue emphasis on the determination, the court finds the determination should be excluded pursuant to Fed. R. Evid. 403.

IV.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or

by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## V.   DISCUSSION.

Jefferson claims he was subject to disparate treatment due to his race while employed at Roadway.   Specifically, he claims he was treated differently with respect to job assignments and equipment access.[4] Pl's. Br.

---

[4]Jefferson further avers he was treated differently with regard "to other terms and conditions of employment." Pl's. Br. p. 3. The court has considered Jefferson's argument and the evidence he cited in support of his disparate treatment claims. Pl's. Br. pp. 14-23, 39-46. The court did not find any clearly articulated claim of disparate treatment other than the claims related to equipment access and job assignments. Roadway moved for summary judgment as to all Jefferson's disparate treatment claims, including any claim related to hours, safety awards, and holiday work schedules. Def's. Br. p. 11. Jefferson did not address these claims in his responsive submission, except that he discussed hours as a part of his job assignments claim. Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); See *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)("[p]resenting . . . arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court"). Accordingly, Jefferson's unaddressed disparate treatment claims will be dismissed without further discussion.

p. 3.  He also claims he was subjected to a hostile work environment at

Roadway.[5]  *Id.*  Roadway contends it is entitled to summary judgment as to

all of Jefferson's claims.

### A.   Disparate Treatment.

Under the burden-shifting *McDonnell-Douglas* framework,[6] a plaintiff

_____

[5]Jefferson expressly abandoned any claim for retaliation or promotion.  Pl's. Br. p. 3.

[6]The plaintiff has not pointed to any direct evidence of discrimination, and relies on circumstantial evidence presented under the framework established in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973), as modified in *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Chapman v. A1 Transporation*, 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc).
    In discussing his disparate treatment claims, Plaintiff makes frequent reference to Nathan Rozea's testimony, affidavit, and declaration.  Pl's. Br. pp. 14-24, Pl's. Ex. 3, 17, 18.  Many of the citations reference Rozea's repetition of statements Shanks or Massey made in his presence.  For example, Rozea testified that Shanks instructed him to treat black and white employees differently.  Rozea Dep., Pl's. Ex. 3, pp. 239, 448.  This testimony is admissible to show that Shanks made the statement, and can serve as evidence of pretext or motive.  *See McDonnell Douglas*, 411 U. S. 792, 800-05 (1973)(discussing the order and allocation of proof in a "private, non-class action challenging employment discrimination," setting forth the prima facie case which must be established by the plaintiff and noting that evidence of employer's general policy and practices would be relevant to prove pretext).  However, the evidence is hearsay if offered to show the truth of Shanks' statement, *i.e.*, that blacks and whites were treated differently at Roadway or that plaintiff was treated in a discriminatory manner.  Thus, Rozea's testimony about Shanks' and Massey's statements is incompetent to prove any element of the plaintiff's prima facie case.  *See* Rozea Dep. pp. 74-85, 200-10, 239, 364-370,448; Rozea 1/18/02 Affidavit ¶¶ 17, 16, 4, 5, 14, 18, 10, 6; Rozea 9/10/02 Declaration, ¶¶ 4, 6, 7, 8, 9.
    Plaintiff also relies on anecdotal evidence of other employee's experiences at Roadway.  Pl's. Br. pp. 14-24, citing Rozea Dep. pp. 29-33, 37-48, 49-55, 56-70, 74-85, 198-200, 200-210, 239, 333-36, 343-62, 350-51, 364-70; Rozea 1/18/02 Affidavit ¶¶ 4, 5, 10, 6; Rozea 9/10/02  Declaration, ¶¶ 4, 6, 7, 8, 9; Cross Dep. pp. 16, 24, 97, 110, 129,

claiming his employer intentionally treated him less favorably due to his race must first establish a prima facie case of discrimination by showing: (1) he belongs to a protected class (2) and was subjected to an adverse job action (3) while similarly situated employees outside the protected class were treated more favorably and (4) he was qualified for his job. *Holifield v. Reno,* 115 F.3d 1555, 1561 (11th Cir. 1997).

      1.    Job Assignments.

Jefferson testified he got assigned to drive "[w]hichever route that day had the most freight." Pl's. Br. p. 14; Jefferson Dep., Pl's. Ex. 1, p. 72, 306-07. Specifically, he testified that he had to take over Randall Boyd's or Don Thomas's assigned runs when those drivers had a "bad" run. Jefferson Dep., Pl's. Ex. 1, pp. 102-11. He testified he checked the trailers when Boyd and Thomas drove the routes and they weren't full. *Id.* at 109. When he ran their trailers they were "packed full." *Id.* at 108, 110. He testified Boyd and Thomas had assigned routes, while he was working

---

216-27; Sanders Dep. pp. 230, 242-43; Kennedy Dep. pp. 135-36, 222, 225, 231-36; Brazelton Declaration, Pl's. Ex. 24, ¶¶ 9, 12; Scruggs Dep. pp. 60, 367-68; Kennedy Declaration, Pl's. Ex. 23, ¶ 18; Brazelton Dep. p. 94, 290. Again, this evidence is admissible to show pretext, but does not help the plaintiff carry his initial burden of proving a prima facie case.

unassigned and subject to being sent on any route.[7]   *Id.* at 104-05.   He thought Boyd and Thomas were at work when he took their route, but he could not remember what they did while he did their route, testifying that "it probably wasn't nothing much." *Id.* at 107-08.  He complained to Massey and Shanks. *Id.* at 101, 183-86.

Jefferson also contends that he had to work longer hours.  Jefferson Dep. p. 306-07.  He testified he had to work fifteen hour shifts on several occasions.  *Id.* at 246-47.  He did not complain and doesn't remember whether he was happy or unhappy about the extra work.  *Id.*  He testified that he knew he worked longer hours than Randall Boyd or Jeff Smith on occasion.  *Id.* at 248-49.  He said Smith and Boyd were working assigned routes, and when they were done they got to go home.  *Id.*  As far as he knew, he was paid for any extra hours.  *Id.* at 469-70.

---

[7]Roadway and the Teamsters Union have a Collective Bargaining Agreement ("CBA") that governs many aspects of the employment relationship between the drivers and Roadway. (Pl's. Br. p. 15).  At Roadway's Huntsville terminal, assignments posted for bid are based on start times.  *Id.*  Drivers are allowed to bid on assignments based on their seniority.  *Id.*  Even though the routes associated with the start times are not posted, employees know from experience that certain runs are associated with certain start times.  *Id.*  Jefferson was bottom man on the seniority list, and took whatever was the last job bid on.  Jefferson Dep. pp. 50-51.

Roadway argues that an undesirable job assignment does not constitute an actionable adverse employment action,[8] and that Jefferson cannot show he was treated differently than similarly situated employees outside the protected class. Def's. Br. pp. 2-5, 14-22.

Jefferson has not pointed to any evidence showing that he was similarly situated to Smith, Boyd and Thomas. It is undisputed that they were  assigned drivers and Jefferson was subject to being sent on any run because he was an "unassigned" driver due to his low seniority status. Jefferson Dep. pp. 50-51. Further, Jefferson does not know what Boyd and Thomas were doing while he was assigned to do their run. His assumption that they were probably just standing around at work while he drove their routes is mere speculation. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (1995)(affirming summary judgment on hostile environment claim where record included, *inter alia*, "alleged incidents, [which] the court correctly held, were purely speculation").

------------------------------------

[8]See *Shannon v. BellSouth Communications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)(reassignment not adverse action); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587-88 (11th Cir. 2001)(undesirable assignments not adverse action).

> To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. . . . In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

> 2.   Equipment Access.

Jefferson claims black employees at Roadway got the worst equipment and had to drive defective tractors and trailers.  Jefferson Dep. pp. 211-18, 306-07.

Jefferson testified that he drove Don Thomas's Decatur route four days but Thomas took the truck with power steering on his alternate route, leaving Jefferson to drive a "frog" with no power steering. *Id.* at 214, 218-22.  Jefferson said that the power steering truck was supposed to go with the route. *Id.* at 214.  Jefferson also testified that he got Jeff Smith's old tractor when Jeff Smith got to use a "road tractor" while the "road driver" who normally drove the tractor rested, but Massey would not let Jefferson go to the motel and get a "road tractor." *Id.* at 214-15, 233-35.  Jefferson

testified Smith had more seniority and was on a dedicated run to Cullman and Holly Pond, while Jefferson was "running wild . . . just what ever route." *Id.* at 234-35.[9] Jefferson came in later than Smith, and always got Smith's tractor when Smith got a road tractor, and "there was nothing the matter with it." Jefferson Dep. pp. 490-93.  Jefferson has, on occasion, gone to the motel and gotten an over-the-road truck. *Id.*

Jefferson also claims he had to drive a truck with a running heater several days one summer, although he saw a few other tractors on the line he could have used. *Id.* at 212-18, 216-17.  Jefferson also testified he complained in writing about problems he had with Roadway vehicles. *Id.* at 214-15, 220-28, 230-32. When he wrote up the problem with the heater, the truck was taken out of service and repaired but the heater problem was not corrected. *Id.* at 223-25.  When equipment is written up, it is taken out of service until it is repaired and the driver who writes it up must approve it going back into service. *Id.* at 222-23, 228-29.  Jefferson could not

---

[9]In support of this claim, Jefferson stated that Rozea told him Stanley Shanks told Rozea the better equipment needs to go to white drivers.  This hearsay evidence, offered to prove the truth of Rozea's statement, is inadmissible. Jefferson Dep. p. 236.

remember that he ever continued to drive equipment after he wrote it up and no one prevented him from writing equipment up. *Id.* at 228-29. Jefferson normally got assigned something else when he complained and didn't know if the equipment he rejected was fixed before somebody else got it. *Id.* at 232-33. He said everybody complained about the equipment, but he didn't talk to everyone and he wasn't sure who complained and who did not complain. *Id.* He did not know if any white employees drove the truck with the broken heater. Jefferson Dep. pp. 217-18.

Not all conduct by an employer negatively affecting an employee constitutes an adverse employment action; there must be some threshold level of substantiality that must be met for unlawful discrimination to be cognizable. *Davis*, 245 F.3d at 1238-39. "'A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits.'" *Id., citing Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)(discussing supervisor's vicarious Title VII liability for sexual harassment)(emphasis in original). Although the Eleventh Circuit has not spoken to the issue, several

courts have said that assignment of inferior equipment is not an adverse employment action. *See Geer v. Marco Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1341 (M.D. Ala. 2001)(improperly functioning cleaning equipment); *Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002)(inferior equipment); *Markel v. Bd. of Regents*, 276 F.3d 906, 911 (7th Cir. 2002)(plaintiff denied better equipment). Here, Jefferson claims he was not allowed to get a "road tractor" on an occasion when Jeff Smith, a more senior driver, got one; he had to drive a truck with a broken heater; and he did not get to use the truck that normally went with the Decatur route when he drove that route for four days. He admits that trucks were taken out of service and repaired when drivers made complaints. His claim does not rise to the level of an adverse employment action.

Furthermore, Jefferson has not presented evidence that his comparators are similarly situated because he admits he was low on the seniority list, and an unassigned driver.

For the stated reasons, Roadway's motion for summary judgment is due to be granted as to Jefferson's disparate treatment claims.

B.    Hostile Work Environment.

    1.    Admissibility of the Evidence.

Roadway contends that much of the evidence Jefferson offers in support of his hostile environment claim is inadmissible hearsay or his own subjective beliefs and unfounded speculation.

Hearsay is an out-of-court statement which is offered into evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. The evidence in question can generally be described as testimony from various Roadway employees that Rozea told them about remarks Shanks or Massey made during a meeting Rozea attended. Rozea's testimony about the remarks would not be hearsay to the extent the out-of-court statements of Shanks and Massey are offered to show the statements were made, not to prove the truth of the matter asserted. Similarly, such testimony from the plaintiff would be admissible to show that Rozea made the statement to him, but not to show the truth of Rozea's statement. However, testimony from anyone other than the plaintiff or Rozea about Rozea hearing Shanks and Massey make such statements is only relevant to prove the truth of Rozea's statement, and is, therefore, inadmissible hearsay. The following evidence

will not be considered because it is inadmissible hearsay: (1) Brazelton Dep., Pl's. Ex. 6, pp. 114-120 (testifying about what Rozea told him Shanks and Massey said and about what Cross told him a co-worker said); (2) Scruggs Dep., Pl's. Ex. 5, pp. 81-92 (testifying about what Rozea told him Shanks, Massey and co-workers said); (3) Kennedy Dep., Pl's. Ex. 4, pp. 118-24, 130-32 (testifying about what Rozea told him Shanks, Massey and a co-worker said); (4) Endsley Dep., Pl's. Ex. 7, p. 111, 118, 157-58, 168, 117-40 (testifying about what Rozea told him Massey said and about what Rozea and other drivers said about work assignments);[10] and (4) Rozea Dep., Pl's. Ex. 3, p. 206 (testifying about what Brazelton told him about Shanks).

Jefferson also relies on the deposition testimony of co-workers regarding comments they heard or incidents they witnessed.  Evidence of comments heard by other persons can be relevant in a Title VII case.  A decisionmaker's routine use of racial slurs can be evidence that racial

---

[10]Plaintiff also cited pages 158, 203 and 315 of Endsley's Deposition.  Pl's. Br. p. 5.  However, Endsley's testimony on those pages was not as Plaintiff represented in brief and is not relevant to the merits of Plaintiff's hostile environment claim.  Endsley Dep. p. 158 (discussing anonymous letters to Roadway); p. 203 (discussing whether Endsley knew he had filed a separate lawsuit against Roadway); p. 315 (discussing whether Endsley knew the union contract prohibited discrimination and if he had ever been arrested).

animus was a motivating factor in making a disciplinary decision. *See, e. g. Brown v. East Miss. Elec. Power Ass'n.,* 989 F.2d 858, 861-62 (5th Cir. 1993). Moreover, a plaintiff may have a viable hostile environment claim even if racial remarks were not directed at her. *Edwards v. Wallace Community College,* 49 F.3d 1517, 1522 (11th Cir. 1995). However, a plaintiff in a hostile environment case must show that the harassing conduct was sufficiently severe or pervasive to alter the terms or conditions of his employment. "This requirement, as defined by the Supreme Court, contains both an objective and a subjective component." *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir. 2002), *citing Harris v. Forklift Systems,* 510 U.S. 17, 21-22 (1993). Incidents unknown to the plaintiff cannot contribute to his subjective view of a hostile environment. *Edwards,* 49 F.3d at 1522. (Discussing incidents made known to the plaintiff after her termination, speculative incidents, statements made to third parties by fourth parties, and incidents cited without information as to when they were made, how they were made and when they became known to plaintiff). The following evidence will not be considered in evaluating Jefferson's hostile environment claim because there is no evidence he knew of the comments

or incidents at any relevant time: (1) Brazelton Dep., Pl's. Ex. 6, pp. 121-25, 302-03 (threat made in '70's by persons no longer at Roadway and comments at unspecified times, with no indication Jefferson had knowledge); (2) Scruggs Dep., Pl's. Ex. 5, pp. 78-87 (comments heard in 1999 and 2000, with no indication Jefferson had knowledge); (3) Kennedy Dep., Pl's. Ex. 4, pp. 118-20, 126-28 (comment and joke on unspecified date, with no indication Jefferson had knowledge); (4) Sanders Dep., Pl's. Ex. 9, pp. 304-08 (comment on unspecified occasion, with no indication Jefferson had knowledge);[11] (5) Rozea Dep., Pl's. Ex. 3, pp. 202-03, 239, 314-19, 449, 455, 457; Rozea 1/18/02 Affidavit, ¶¶ 14, 15, 19 (comments by supervisors, with no indication Jefferson had knowledge);[12] (6) Cross Dep., Pl's. Ex. 2, pp. 61-66, 268-70 (Shanks saying "be still" with no indication Jefferson had

---

[11]Plaintiff cited additional testimony of James Sanders.  However, Sanders' testimony on those pages was not as Plaintiff represented in brief and is not, in any event, relevant to the merits of Plaintiff's hostile environment claim.  Sanders Dep., Pl's. Ex. 9, pp. 135-36, 139 (discussing opportunities to voluntarily leave work early).

[12]Plaintiff cited portions of Rozea's deposition that do not appear to be relevant to his hostile environment claim.  Rozea Dep., Pl's. Ex. 3, pp. 178-80 (testifying he thought Shanks was racist).  The court has considered Plaintiff's testimony about what Rozea told him, as discussed below.

knowledge);[13] and (7) Cross Declaration, Pl's. Ex. 2 (stating he heard co-worker use racial slur at some unspecified time, with no evidence Jefferson had knowledge).

Jefferson also relies, in part, on his EEOC charge to prove the merits of his hostile environment claim.  Pl's. Br. p. 5; Pl's. Ex. 12.  As a general rule, this court must consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" to determine if there is a genuine issue of material fact.  Fed. R. Civ. P. 56.  The EEOC charge is relevant to an argument about the timeliness of plaintiff's hostile environment claims.   However, the charge itself is irrelevant to show the merits of the claim.  "On summary judgment, the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  Therefore, the

---

[13]The court has considered Jefferson's testimony about his knowledge of Cross's experience, as discussed below.

EEOC charge will not be considered in reviewing the merits of Jefferson's hostile environment claim.

Accordingly, the evidence considered in evaluating Jefferson's hostile environment claim will be limited to the following, cited in Jefferson's brief:

(1) Jefferson's testimony that co-worker Sean Scruggs pointed out two dolls hanging on a bulletin board in the office, and Jefferson considered the dolls to be racially offensive because they had "dreadlocks" type hair and the dolls were attached to the bulletin board by a string around their neck. Jefferson didn't complain about the dolls because Scruggs told him he had already complained to Shanks.  The dolls were finally removed when Scruggs complained at least once more, but Jefferson testified he saw them every day "for several months" as best he could remember.[14] Jefferson Dep., Pl's.

---

[14]As discussed *infra*, Jefferson's and Scrugg's testimony about the dolls' appearance is inconsistent on many points.  Similarly, their testimony about when the dolls were in the office was inconsistent.  Jefferson testified he saw the dolls for months, although he could not remember clearly.  However, Jefferson did not start working at Roadway until September of 1999, Pl's Br. p. 1; Def's Br. pp. 3-4, and Scruggs testified he first saw the dolls in June of 1999, that he made three complaints within four to five weeks, and that the dolls were removed after the third complaint. The court has construed this evidence in the plaintiff's favor, and assumed he saw the dolls every day for several months.

Ex. 1, pp. 262-74.  Scruggs testified that he first noticed the dolls in June of 1999 and first complained to Shanks a day or two later.  Scruggs Dep., Pl's. Ex. 5, pp. 103, 106-07.  Scruggs testified that, when he told Shanks the dolls were offensive, Shanks said "that's no racial thing, there shouldn't be any racial tension coming out of that because it's used as a dammit doll, one takes out his or her frustrations on a doll."  *Id.* at 108.  Scruggs testified that he got the same response the second time he brought the matter up, a "week or so" later.  *Id.* at 108-09.  The third time he spoke with Shanks, about a week after the second conversation, the dolls were removed.  *Id.* at 111-12.  Roadway points out that black co-worker Ruben Cross didn't pay much attention to the dolls.  Cross Dep., Pl's. Ex. 8, pp. 211-15.

(2) Co-workers Randall Boyd and "D. H." would say things like, "[W]hat's going on, boy?"  Jefferson didn't think Boyd meant anything by it, but he felt D. H. said it in a derogatory way, like "[C]ome here, boy."  Jefferson never complained to any supervisors, but told both men to stop the practice and he felt sure they did.  Other than these incidents with Boyd and D. H., Jefferson never heard any co-worker or customer use offensive language.  Jefferson Dep. pp. 169-78, 448.

(3) Jefferson's testimony that he found a paper turned over on an unknown dispatcher's desk which contained "ebonic" jokes he found offensive.  He did not complain or show the jokes to anyone until Roadway employees started meeting about the situation and he still did not show the paper to management at Roadway.  Jefferson Dep. pp. 156-66.

(4) Jefferson's testimony that Shanks said "be still and look at me when I'm talking to you," during a meeting when Jefferson was moving around and popping his neck.  Ruben Cross and Billy Kennedy told Jefferson Shanks had told them to be still on other occasions.  Jefferson Dep. pp. 120-25, 200-03, 306-07.

(5) Jefferson's testimony that Shanks criticized the way he loaded trailers and did things around the terminal on about fifteen occasions.  Jefferson thought his trailer would be loaded better than Dane's, but Shanks would compliment Dane and criticize Jefferson.  On about five of those occasions, Shanks got complaints about loads from Nashville and he criticized Jefferson even if it wasn't Jefferson's load.   Sometimes complaints from Nashville were about his load.  When it wasn't his load,

Jefferson pointed it out and Shanks would just say to do better.  Jefferson Dep. pp. 92-100.

(6) Jefferson testified that, on at least twenty occasions during the first year he worked at Roadway, Nathan Rozea told him that racist remarks and slurs were used by management.  Rozea told him Shanks called blacks "black cobra snakes," "worthless niggers," "stupid," "illiterate," "slow," and used the term "nigger" a lot.   Rozea told him Massey called Kennedy a "stupid big black nigger" and "worthless," told racist jokes, had dogs named "Nigger" and "Spook," told Shanks to "get rid of that nigger" [Kennedy], and that Massey recommended he [Rozea] take the supervisor job to get rid of "worthless niggers" who are "drug addicts and dope smokers."  Sean Scruggs and Billy Kennedy told Jefferson that they had heard these things from Rozea also.  Jefferson Dep. pp. 134-49.  Jefferson testified he never personally heard Shanks, Massey or Gordon use racially offensive language.  *Id.* at 129-31, 448.  However, he believed Rozea was telling the truth.  *Id.* at 449-50.  Because Rozea's statement to Jefferson is only admissible to show the statement was made, Jefferson's evidence is relevant only to Jefferson's subjective view of the working environment at

Roadway.  Rozea's testimony and statements are admissible to show that Shank's and Massey's statements were made, but not to show the truth of the statements.

(7) Jefferson's testimony that Rozea told him co-worker Janice used a racial slur on one occasion, and that Cross told him co-worker D. H. used a racial slur.  There is no indication when the comments were made or when Jefferson was told.  Jefferson Dep. pp. 142, 153-544.  Jefferson's testimony is relevant to Jefferson's subjective view of the working environment at Roadway, but not for the truth of Rozea's or Cross's statements.[15]

(8) Jefferson's testimony that Billy Kennedy said Rozea told him Massey said, "I hate that worthless nigger" in reference to Kennedy.  Jefferson Dep. p. 150.  Because Jefferson's testimony about Kennedy's statement is not admissible to show the truth of the statement, this evidence is only relevant to Jefferson's subjective view of the working environment at Roadway.

_____

[15] Jefferson submitted Cross's declaration, in which Cross stated that he heard a racial slur by an unidentified supervisor at an unspecified time.  Pl's. Ex. 2, ¶ 2.  However, Jefferson testified that Cross told him of a slur by a co-worker.  Jefferson Dep. pp. 153-54.  There is no evidence that Jefferson knew about the slur Cross speaks to in his declaration.

(9) Jefferson's testimony that Sean Scruggs said he complained to Rozea about a co-worker's racial slur and Rozea told him that Shanks said "don't worry about that." Jefferson Dep. p. 178-79.  Because Jefferson's testimony about Scrugg's statement is not admissible to show the truth of the statement, this evidence is only relevant to Jefferson's subjective view of the working environment at Roadway.

In addition to the evidence set out above, Roadway points to Jefferson's statement at his deposition, when he was asked if he had "been subjected to racial harassment at Roadway."  Jefferson responded "not to my knowledge."  Jefferson Dep. p. 281-82.  When Jefferson asked for clarification, he was asked "[h]ave you been subjected to harassment because of race at Roadway?" and he responded, "Not that I know of." *Id.* He then testified he had been subjected to a hostile environment, which he defined as a hard place to work, because he heard about people who dislike him because of his race. *Id.* at 283-84.  He then stated he could tell people disliked him because of Rozea's comments and the way he was treated. *Id.* at 284-85.

2.    The Merits of the Hostile Environment Claim.

Roadway claims it is entitled to summary judgment on Jefferson's harassment claim because the conduct he alleges is not sufficiently severe to establish an objectively hostile working environment.   "[C]laims of employment discrimination . . . present fact intensive issues. However. . . motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc)(quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n.8 (5th Cir. 1999)).

To establish a hostile work environment claim under Title VII, the plaintiff must show "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), *citing Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).  To prevail on a claim that he has been subjected to a racially hostile work environment, the plaintiff must present sufficient evidence to show: (1) he

belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Harassing conduct is severe or pervasive if it results in (1) an environment that a reasonable person would find hostile or abusive; and (2) an environment that the victim subjectively perceives to be abusive. *Harris*, 510 U.S. at 21-22. Jefferson has presented sufficient evidence that he subjectively perceived his work environment at Roadway to be hostile. However, Jefferson must also show he was subjected to a working environment that a reasonable person would find hostile or abusive because of race. *See Mendoza*, 195 F.3d 1247-53 (discussing sufficiency of sexually hostile work environment showing). In evaluating the objective severity of harassing conduct, the court must consider the totality of the circumstances, including, among other factors: (1) the frequency of the

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276.

"First and most importantly" Jefferson did not present evidence of any physically threatening or humiliating behavior or show that the cumulative effect of the alleged conduct unreasonably interfered with his job performance. *Mendoza*, 195 F.3d at 1248.

This court has considered evidence about the doll display in another case. *See Sean Scruggs v. Roadway Express, Inc.*, CV-01-CO-1959-NE, October 28, 2003, Memorandum of Opinion, Doc. 87, pp. 19-20.[16] Like Sean

---

[16]The evidence about the appearance of the doll display is inconsistent. As this court noted in *Scruggs*, "Scruggs testified he saw two dolls, one larger white textured doll with dreadlocks hanging by a rope around its neck from the bulletin board and one 'brown textured' doll with no discernable hair hanging  by a tack from the bulletin board. [Scruggs Dep. pp. 92-108.] One doll had a note under it that said, 'Today is not your day,' or words to that effect. *Id.* Scruggs thought the brown textured doll was supposed to be an animal, but felt the white textured doll was 'like a racial thing here in the south that reminds [him] of . . . heritage' he does not like. [Scruggs  Dep. p. 96.] Maurice Jefferson testified he saw two dolls made of black cotton material with dreadlocks for hair hanging by a string around their necks on a board near the dispatcher's office.  [Jefferson Affidavit, Doc. # 59, Vol 2, Ex. 4, pp. 262-70.] Jefferson did not complain about the dolls because Sean Scruggs had already complained.  *Id.*  The defendant submitted a photograph, which Stanley Shanks stated was a true and correct photograph of the only doll ever posted at the Huntsville terminal to his knowledge. [Doc. #43, Affidavit of Stanley Shanks.]  The black and white photocopied photograph

Scruggs, Jefferson presented evidence that he subjectively viewed the dolls as a depiction of black persons being lynched.  The doll's owner might have intended to depict a lynching or may have been unaware of, or insensitive to, the possible context a black viewer of the display might bring to it.[17] Innocuous comments or conduct, even if boorish, are not considered in evaluating a hostile work environment claim, since Title VII is not a "general civility code." *Gupta*, 212 F.3d 583.  In *Scruggs*, the court concluded there was no evidence of context to resolve the display's ambiguity.   *See Mendoza*, 195 F.3d at 1248 (observing alleged comments could have had sexual connotations in some circumstances, but that there was no context indicating sexual connotation was appropriate in the circumstances of this interaction).

_____

depicts one pale doll with short, possibly curly hair attached to the bulletin board by no visible means.  A sign, similar to one described by Sean Scruggs, is near the doll.  There is no evidence that Scruggs was ever shown the photograph or agreed that it depicted the display he saw." *Scruggs*, October 28, 2003, Memorandum of Opinion, pp. 15-16, n.9.  The identical evidence was submitted in this action.  Pl's. Ex. 1, 5; Doc. 58, Ex. 9.  No description of the display unambiguously depicts a lynching, so that regardless of which description is accepted by the jury, the plaintiff has the burden of submitting additional evidence resolving the ambiguity.

[17]The court is not accepting as true Stanley Shanks' out-of-court statement to Scruggs that the dolls were "dammit dolls." Scruggs Dep. p. 108.  Rather, his testimony is an example of an equally likely purpose for the display.

In contrast, the paper with "ebonic" jokes is unambiguously racially hostile.   If the owner of the paper were known, it would tend to show his or her state of mind and add context to more ambiguous conduct or comments.  Unfortunately, Jefferson does not know who owned the paper or who knew about the paper other than himself.   Moreover, the circumstances in which Jefferson found the paper were accidental, and the paper was placed face down on an unknown dispatcher's desk.  This context does not indicate it was intended to harass him or any other black Roadway employee.

The "boy" comments made by Jefferson's co-employees are also ambiguous. Jefferson has made no showing that these men addressed white employees any differently. *See Mendoza*, 195 F.3d at 1253-54 (Edmondson, J., concurring) (discussing showing plaintiff should make if sexual content of conduct and comments is not obvious).[18]  Statements and conduct must be racially related before they are to be considered in determining whether

_____

[18]To the extent Jefferson testified about racially hostile comments of co-employees he heard second-hand, he has not testified that he heard of such comments made to others by either of these co-employees.

the severe or pervasive requirement is met. *Gupta,* 212 at 583 (discussing sexually hostile environment claim).

Jefferson also relies on racially hostile comments made by Shanks and Massey which he heard about, second-hand, from Rozea. Unlike Scruggs, Jefferson testified he believed Rozea, and the comments therefore contributed to his subjective view of the working environment at Roadway. Furthermore, a plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at him. *Edwards,* 49 F.3d at 1521 (citation omitted). However, problems with hearsay and the contemporaneity of the plaintiff's knowledge are common when the plaintiff relies on comments made entirely outside his presence. *Edwards,* 49 F.3d at 1522.

Finally, Jefferson points to Shank's criticism of his job performance, and to Shanks admonishing Jefferson to "be still" during a discussion. By themselves, these incidents have no obvious racial overtones.[19] Considering

---

[19]Jefferson believed his work was better than co-employee Dane's and above criticism, but there is no evidence to back up his belief. Similarly, there is no showing white employees were not confronted with photographs from Nashville of bad loads made by other employees. Although Jefferson presented evidence of two black employees Shanks told to "be still," he did not show that white employees were treated

the incidents in conjunction with Rozea's testimony that Shanks frequently used racial pejoratives, a reasonable person might conclude Shanks acted out of racial bias.[20]

The plaintiff in *Scruggs* has asked the Eleventh Circuit Court of Appeals for review of the court's decision in his case.  Because Jefferson relies on evidence nearly identical to that relied upon in *Scruggs*, the circuit court's decision in that matter will provide material guidance to the disposition of Jefferson's hostile environment claim.  Accordingly, Roadway's motion for summary judgment will be denied as to Jefferson's hostile environment claim, without prejudice to Roadway's right to renew the motion after the Eleventh Circuit renders a decision in *Scruggs*.

> 3.   Roadway's Liability.

Roadway argues it is not subject to liability because Jefferson never complained and Roadway responded promptly to other concerns.

---

differently in the same situation.

[20]In harassment cases, the courts must consider the alleged conduct in context and cumulatively.  *Mendoza*, 195 F.3d at 1242.

When a plaintiff shows harassment by a supervisor, and no tangible employment action is involved, the employer is vicariously liable unless it establishes an affirmative defense. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (if the plaintiff satisfies his burden, the defendant-employer is entitled to assert the *Faragher-Ellerth* affirmative defense). *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

"The [*Faragher-Ellerth*] 'defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior *and* (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm.'" *Frederick*, 246 F.3d at 1313, *citing* Faragher, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765 (emphasis in original). Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements. *Id*.

Because Jefferson presents some evidence that a supervisor contributed to his hostile environment claim, Roadway must show there is

no question of material fact as to both elements of the *Faragher-Ellerth* defense.   In this action, questions of material fact prevent summary judgment for Roadway on the basis of its affirmative defense.

VI.   CONCLUSION.

Roadway's motion for summary judgment will be granted as to all of Jefferson's claims except the hostile environment claim.  A separate order in conformity with this opinion will be entered.

Done, this __31ST__ of March, 2004.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
